1  Wm. Michael Whelan, Jr., ESQ. (CA Bar No. 112190)
   95 S. Market Street, Suite 300
2  San Jose, California 95113
   (650) 319-5554 telephone
3  (4150 874-7082 facsimile
   whelanlaw@gmail.com
4
   Attorney for Defendant
5  MAX BUDZIAK

**GOVERNMENT EXHIBIT**

CASE NO. EP11CR2728KC

EXHIBIT NO. C (MTC)

6

7

8              IN THE UNITED STATES DISTRICT COURT

9           FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                     SAN JOSE DIVISION

11

12  UNITED STATES OF AMERICA          Case No. CR-08-00284-RMW

13        Plaintiff,

14  vs.                               **NOTICE OF MOTION AND
                                      MOTION TO COMPEL DISCOVERY
15                                    PURSUANT TO RULE 16(a)(1)(E)
    MAX BUDZIAK,                      AND *BRADY***

16        Defendant.

17                                    Date: December 20, 2010
                                      Time: 9:00 a.m.
18                                    Courtroom: 6
                                      Magistrate Judge: Ronald M. Whyte
19                                    Time Est: 90 minutes

20

21  TO THE CLERK OF THE ABOVE-ENTITLED COURT AND TO THE UNITED
    STATES ATTORNEY FOR THE NORTHERN DISTRICT OF CALIFORNIA:

22
        PLEASE TAKE NOTICE that on December 20, 2010 at 9:00 a.m. in Courtroom 6
23
24  of the above-entitled court located at 280 S. First St., San Jose, CA the Honorable Ronald

25  M. Whyte presiding, the defendant, Max Budziak, by and through his attorney of record,

26  Wm. Michael Whelan, will move the Court pursuant to Criminal Local Rule 16-2 for an

    order compelling discovery in this case. Specifically, the defendant will move for an order

compelling discovery of the following:

1. The technical specifications and documentation regarding the enhanced version of the LimeWire peer to peer (P2P) software designed by the FBI and used in the investigation of this case.

2. An order requiring the prosecution to provide an installable copy of the eP2P software used in this case for review by computer forensic expert Ronald Short and Mr. Budziak's counsel. This order is to be subject to whatever protective orders the Court finds appropriate.

3. In the alternative, an order compelling the government to provide to the defense a complete written description of the capabilities of the government's enhanced LimeWire software program used in this case in June 2007, in comparison to the LimeWire software available to the public in June 2007.

This motion is based on the Fifth, Sixth and Fourteenth Amendments to the United States Constitution, Rule 16(a)(1)(E) of the Federal Rules of Criminal Procedure and Criminal Local Rule 16-2. The items requested constitute documents or data material to preparing the defense, material to the determination of Budziak's motion to suppress the warrantless remote search of his computer, and exculpatory material to be disclosed under *Brady v. Maryland,* 373 U.S. 83(1963).

The discovery requested in this motion was requested in an informal e-mail discovery request from Wm. Michael Whelan to AUSAs Eumi Choi, Allison Danner and Bradley Price on December 1, 2010. Furthermore, AUSA Danner does not object to this motion being filed on shortened time.

WM. MICHAEL WHELAN, JR.
ATTORNEY AT LAW
95 S. MARKET STREET, SUITE 300
SAN JOSE, CALIFORNIA 95113
(650) 319-5554

MOTION TO COMPEL DISCOVERY PURSUANT TO RULE 16(a)(1)(E) AND *BRADY*

WM. MICHAEL WHELAN, JR.
ATTORNEY AT LAW
95 S. MARKET STREET, SUITE 300
SAN JOSE, CALIFORNIA 95113
(650) 319-5554

1    This motion is now made, following two prior denials of defense motions for

2  disclosure of similar discovery, based on new information learned recently as a result of a

3  civil injunction against LimeWire in SDNY Case No. 06-Civ-05963. That injunction and

4  the actions of the LimeWire corporation as a result of the injunction revealed that a

5  "backdoor" existed in LimeWire allowing the software to be remotely manipulated, which

6  is the defendant's claim.  The need to review the eP2P software arises from the disclosure

7  of this new information. Should the eP2P software take advantage of this backdoor, the

8  warrantless searches of Budziak's computer on June 6 and June 14, 2007 (the dates he is

9  charged in this case with distribution of child pornography) would be prohibited by the

10  Fourth Amendment to the United States Constitution.

11    This motion is also based on this Notice, the Points and Authorities which follow, the

12  Declarations of Wm. Michael Whelan, Forensic Specialist Ronald Short, and Max

13  Budziak filed herewith, all records, files and pleadings previously filed in this action,

14  including, but not limited to, the prior Motion to Compel Discovery and *Franks* Motion to

15  Suppress evidence and their supporting declarations, and such evidence and argument as

16  may be presented at the time of the hearing.

                                       Respectfully submitted,

Dated: December 13, 2010               _____

                                       Wm. Michael Whelan, Jr.
                                       Attorney for Defendant
                                       Max Budziak

MOTION TO COMPEL DISCOVERY PURSUANT TO RULE 16(a)(1)(E) AND *BRADY*

## Questions Presented

1. Is forensic evaluation of the FBI's eP2P software to determine whether it makes use of a known "backdoor" in the LimeWire software material to the defense's preparation of the case?

2. May the government prevent examination of the eP2P software under the qualified "law enforcement privilege?"

## Points and Authorities

## Statement of Facts

1.  Defendant Budziak contends, but prior defense counsel never litigated, that the FBI's warrantless remote searches of and remote seizures from his computer by the FBI on June 6, and 14, 2007 (the dates he is charged with distribution via sharing over the internet child pornography) was illegal. The government contends that the agents legally accessed (via an internet "plain view" search) a shared filed folder or folders on the defendant's computer and downloaded from there images of child pornography. In short, the government contends that Mr. Budziak made images on his computer available for sharing with/to other public users of LimeWire on the internet. Mr. Budziak contends that he knew how to operate the LimeWire software installed on his computer and that he specifically disabled the default share functions on that computer, making it impossible for other remote LimeWire users from accessing files on his computer. *See* Declaration of Max Budziak (electronically filed separately as Exhibit A). Therefore, he contends that FBI agents illegally accessed his computer either through (a) undisclosed "enhanced" features of the FBI's proprietary version of LimeWire, and/or (b) through entry via a

-4-

WM. MICHAEL WHELAN, JR.
ATTORNEY AT LAW
95 S. MARKET STREET, SUITE 300
SAN JOSE, CALIFORNIA 95113
(650) 319-5554

1  "backdoor" embedded in the software by LimeWire and utilized by the government

2  agents.

3      2.     Two previous Motions to Compel Discovery have been litigated in this

4  matter, both brought by Mr. Budziak primarily to attempt to determine whether the files

5  downloaded from the IP addresses associated with his home were downloaded from a

6  single computer, his, or from multiple computers as is standard to LimeWire. Both

7  motions were denied. New public LimeWire disclosures, not known at the time these

8  prior motions were litigated, for the basis for the instant motion.

9      During the prior discovery litigation in this case, and as an alternate to production

10  of the eP2P software for forensic examination, the Government provided Mr. Budziak

11  with a series of logs generated by the eP2P software. These logs describe the direct

12  transfer of data between a computer at an IP address assigned to Mr. Budziak and a

13  computer operated by an FBI agent. They do not describe the means by which the FBI

14  computer gained access to the file listings present on the computer at Mr. Budziak's IP

15  address, nor where on the defendant's computer these files were found.

16      The defense's second Motion to Compel was denied by the Court on May 14, 2009.

17  Prior to and since that time, LimeWire has been the subject of ongoing civil litigation

18  brought by various organizations representing recording artists in *Arista Records LLC, et*

19  *al. v. Lime Wire LLC, et al.* S.D.N.Y. Case No. 06-Civ-05936. As a result of this

20  litigation, LimeWire entered into a consent injunction on August 9, 2010, ordered into

21  effect by Judge Kimba Wood on October 26, 2010 (separately filed electronically as

22  Exhibit B).

WM. MICHAEL WHELAN, JR.
ATTORNEY AT LAW
95 S. MARKET STREET, SUITE 300
SAN JOSE, CALIFORNIA 95113
(650) 319-5554

WM. MICHAEL WHELAN, JR.
ATTORNEY AT LAW
95 S. MARKET STREET, SUITE 300
SAN JOSE, CALIFORNIA 95113
(650) 319-5554

1       To comply with this injunction, LimeWire must, among other things, disable

2  "legacy," i.e. older, versions of the LimeWire software.[1] In order to do so, LimeWire

3
   activated a "backdoor" in the LimeWire software that allowed LimeWire LLC to remotely
4
   manipulate the LimeWire software settings of individual users computers to, effectively,
5
6  disable the software. (*See* Exhibit C, page 13 at 3(e), filed separately electronically). The

7  defense learned of this injunction and the implications of it during the week of November

8
9  22, 2010.

10      The existence of this previously unknown "backdoor" in the LimeWire software

11  supports Budziak's theory of defense, that he had his share functions turned off and the

12  FBI accessed his computer illegally. The new information necessitates the instant

13
   discovery motion which requests that this Court order the government to disclose: (a) The
14
   technical specifications and documentation regarding the enhanced version of the
15
16  LimeWire peer to peer (P2P) software designed by the FBI and used in the investigation

17  of this case, (b) subject to appropriate protective orders, an installable copy of the eP2P

18
   software used in this case for review by computer forensic expert Ronald Short and Mr.
19
20  Budziak's counsel, or (c) in the alternative, an order compelling the government to provide

21  to the defense a complete written description of the capabilities of the government's

22  enhanced LimeWire software program used in this case in June 2007, in comparison to the

23
   LimeWire software available to the public in June 2007.
24

25

26

MOTION TO COMPEL DISCOVERY PURSUANT TO RULE 16(a)(1)(E) AND *BRADY*

WM. MICHAEL WHELAN, JR.
ATTORNEY AT LAW
95 S. MARKET STREET, SUITE 300
SAN JOSE, CALIFORNIA 95113
(650) 319-5554

## Argument

## I.   Forensic examination of the eP2P software to determine whether it uses a backdoor in the LimeWire software is material and necessary to the preparation and presentation of Mr. Budziak's case

Under the Federal Rules of Criminal Procedure Rule 16(a)(1)(E) permits defense inspection of Government documents and data that are "material to preparing the defense." Additionally, *Brady*[2] and progeny mandate the disclosure of potentially exculpatory information.

Rule 16(a)(1)(E) requires only a "threshold showing" of "facts which would tend to show that the Government is in possession of information helpful to the defense."[3]

Here, Budziak will meet the threshold showing because the FBI possesses the eP2P software that accessed Budziak's computer, because the LimeWire software contains a "backdoor" that the eP2P software could have taken advantage of, and because the means by which that software accessed the files downloaded will determine the outcome of the Motion to Suppress the search of Budziak's computer.

As described in the attached declaration, Budziak understood the LimeWire software, and decided not to share files -- changing a series of settings in the software to prevent files from being shared with others, including remotely situated FBI agents, on the LimeWire network.

### A.   The exploitation of a LimeWire "backdoor" by the FBI's eP2P software would violate the 4th Amendment

As discussed in the statement of the case, as well as in the referenced PC Magazine

MOTION TO COMPEL DISCOVERY PURSUANT TO RULE 16(a)(1)(E) AND *BRADY*

WM. MICHAEL WHELAN, JR.
ATTORNEY AT LAW
95 S. MARKET STREET, SUITE 100
SAN JOSE, CALIFORNIA 95113
(650) 319-5554

1   article and the Declaration of Ron Short (Exhibit D filed separately electronically), a

2   number of versions of the LimeWire software contain a confirmed "backdoor" that allows

3   the software to be manipulated remotely.  Given the nature of the LimeWire software,

4

5   such a "backdoor" could easily be designed to permit remote access to files that were

6   otherwise not intended to be shared with the LimeWire network and therefore subject to

7   an expectation of privacy and the protections of the 4th Amendment against warrantless

8   searches.

9

10      The Defense's Motion to Suppress is based on *Kyllo v. United States*[4]. Specifically,

11  that if eP2P software took advantage of a "backdoor" in the LimeWire software in order to

12  circumvent or overcome a LimeWire user's security settings to access files that would be

13  inaccessible to an ordinary user of the LimeWire software, such search would be enhanced

14

15  by technology not in public use as prohibited in *Kyllo*.  The government has previously

16  admitted in court filings in this case that it's agents used an enhanced version of

17  LimeWire not in public use.

18

19      Because of the potential for suppression of evidence based on the means of access

20  to Budziak's computer, a forensic examination of the eP2P software used by the agents in

21  this case would be both material and potentially exculpatory.

22              **B. The Government's declarations do not demonstrate personal**
23                  **knowledge of the means by which the eP2P software connects to the**
                    **remote LimeWire software**
24

25      In its Renewed Opposition to Defendant's Discovery request, the Government

26  provides a declaration from Jacqueline Dougher, an Agent responsible for training other

---

[2] *Brady v. Maryland,* 373 U.S. 83(1963).
[3] *U.S. v. Mandel* 914 F.2d 1215, 1219 (9th Cir. 1990).

Agents on the use of the eP2P software.[5] In her declaration, Agent Dougher does not claim knowledge of the technical means by which the eP2P software interfaces with remote LimeWire software, nor does she describe a software or network engineering background that would aid in her understanding. To the contrary, she states that Agents are restricted from seeing the source code to discern how it operates.[6] There is no mention of her having reviewed the source code, and no indication of personal knowledge of whether the eP2P software circumvents the protections against sharing available in ordinary LimeWire software.

Nonetheless, even were a declaration to describe in detail these functions, the defense may not be limited to relying on Government representations, and is entitled to its own forensic analysis of the software.

## C. Forensic examination of the eP2P software would reveal whether the software exploits a backdoor in the LimeWire software

The Government has previously opposed disclosure of the software on the grounds that a forensic examination would reveal nothing of value to the defense, arguing that the "source code" to the software is "locked" and the version distributed cannot be examined in a way that reveals how it works.

As described in Mr. Short's declaration, there are other means of examining software's functionality than having access to the source code. These methods will be just as effective at determining whether the eP2P software overcomes the security settings of a

WM. MICHAEL WHELAN, JR.
ATTORNEY AT LAW
95 S. MARKET STREET, SUITE 300
SAN JOSE, CALIFORNIA 95113
(650) 319-5554

---

[4] *Kyllo v. United States*, 533 U.S. 27 (2001).
[5] United States' Renewed Opposition to Defendant's Discovery Motion, Attachment D.
[6] Id. at ¶6.

MOTION TO COMPEL DISCOVERY PURSUANT TO RULE 16(a)(1)(E) AND *BRADY*

1  LimeWire user as a source code examination.

## II. If the eP2P software operates as described in the Government's declarations, forensic examination of the software will not jeopardize past, present or future law enforcement investigations.

In previous oppositions to disclosure of the eP2P software, the Government has introduced declarations and argument presenting two conflicting positions:

1. The eP2P software "only provides capabilities already present in the [publically available LimeWire software]." "Therefore, the software is more limited than the original [LimeWire software]." [7]

2. The eP2P software is a sensitive law enforcement technique, subject to non-disclosure agreements, and disclosure may jeopardize many ongoing investigations. [8]

The Government cannot have it both ways.

### A. The government has already disclosed in discovery that the FBI uses eP2P software to investigate child pornography distribution on LimeWire

The Government has disclosed to the Defense through discovery and declarations that the FBI uses eP2P software with built-in single-IP downloading, in-client screen capturing, automatic packet logging and re-assembly, and a feature that appears to check MD5 hash identifiers against known child pornography images. No protective orders have been sought prior to these disclosures.

### B. If the eP2P software uses proprietary means or a "backdoor" to access files on remote computers running LimeWire, then it must be subject to forensic examination to determine whether it is subject to a *Kyllo* challenge.

---

[7] Id. at ¶3.
[8] United States' Renewed Opposition to Defendant's Discovery Motion at p.8.

-10-

WM. MICHAEL WHELAN, JR.
ATTORNEY AT LAW
95 S. MARKET STREET, SUITE 300
SAN JOSE, CALIFORNIA 95113
(650) 319-5554

WM. MICHAEL WHELAN, JR.
ATTORNEY AT LAW
95 S. MARKET STREET, SUITE 300
SAN JOSE, CALIFORNIA 95113
(650) 319-5554

The Government has not proffered any reason as to why the eP2P software should be protected from forensic analysis, other than that it is closely guarded by the FBI. At a minimum, the reasons for this guardianship should be subject to scrutiny. The "law enforcement privilege" cited by the Government in previous oppositions is a qualified privilege that "requires a case by case balancing process. . ."[9]

In *Kyllo*, the U.S. Supreme Court held that when the "Government uses a device that is not in general public use, to explore details of the home that would previously have been unknowable without physical intrusion, the surveillance is a "search" and is presumptively unreasonable without a warrant."[10]

What the Government proposes here is the equivalent of the law enforcement agency in *Kyllo* refusing to submit the thermal imaging device at issue for examination to determine whether it was a device "in general public use."

Determining whether the eP2P software goes beyond that which is available for general public use under *Kyllo* will be determinative of the Motion to Suppress, and as such the qualified law enforcement privilege is well outweighed by Mr. Budziak's interest in examining the software.

Any concerns about revealing law enforcement techniques are easily assuaged by a protective order limiting disclosure of information learned during the evaluation.

## Conclusion

By introducing the declarations of Ron Short and Max Budziak, the defense has

---

[9] U.S. v. Van Horn 789 F.2d 1492 (11th Cir. 1986).

[10] *Kyllo*, *supra* at 40.

MOTION TO COMPEL DISCOVERY PURSUANT TO RULE 16(a)(1)(E) AND *BRADY*

WM. MICHAEL WHELAN, JR.
ATTORNEY AT LAW
95 S. MARKET STREET, SUITE 300
SAN JOSE, CALIFORNIA 95113
(650) 319-5554

made sufficient showing that use of the eP2P software may violate the 4th Amendment's warrant requirement for searches and seizures. This information is both material and essential to the defense's preparation and presentation of the case, in particular the litigation of the concurrent Motion to Suppress.

The Government has not shown any compelling law enforcement justification to prevent forensic review of the eP2P software. Instead, the Government has jumped to the conclusion that since the software is closely protected by the FBI, it should remain closely protected for fear of interfering with investigations. Because the defense has established that the forensic evaluation of the eP2P software is material to its presentation of the case and potentially exculpatory, and because no law enforcement privilege outweighs this need, the defense moves the Court for and order compelling the government to:

(a) Disclose, subject to appropriate protective orders, the technical specifications and documentation regarding the enhanced version of the LimeWire peer to peer (P2P) software designed by the FBI and used in the investigation of this case;

(b) Provide to the defense, subject to appropriate protective orders, an installable copy of the eP2P software used in this case for review by defense computer forensic expert Ronald Short and Mr. Budziak's counsel; or

(c) In the alternative, an order compelling the government to provide to the defense a complete written description of the capabilities of the government's enhanced LimeWire software program used in this case in June 2007, in comparison to the LimeWire software available to the public in June 2007; and \

(d) any other orders that the Court deems appropriate.

Respectfully submitted,

Dated: December 13, 2010

_____
WM. MICHAEL WHELAN, JR.
Attorney for Defendant Max Budziak

## DECLARATION OF WM. MICHAEL WHELAN, JR.

I, Wm. Michael Whelan, Jr., declare and state as follows:

1.      I am an attorney licensed to practice in the State of California and the United States District Court for the Northern District of California, and am the attorney of record for the defendant Max Budziak in the captioned matter.

2.      All facts alleged in the instant motion are alleged in good faith to be true and correct as based upon either information and belief (arising from defense investigation and expert consultation) or upon personal knowledge.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 13, 2010 at San Francisco, California.

_____
Wm. Michael Whelan, Jr.

WM. MICHAEL WHELAN, JR.
ATTORNEY AT LAW
95 S. MARKET STREET, SUITE 300
SAN JOSE, CALIFORNIA 95113
(650) 319-5554

-13-

Wm. Michael Whelan, Jr., ESQ. (CA Bar No. 112190)
95 S. Market Street, Suite 300
San Jose, California 95113
(650) 319-5554 telephone
(4150 874-7082 facsimile
whelanlaw@gmail.com

Attorney for Defendant
MAX BUDZIAK

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>Plaintiff,<br><br>vs.<br><br>MAX BUDZIAK,<br><br>Defendant. | Case No. CR-08-00284-RMW<br><br>**DECLARATION OF MAX BUDZIAK IN SUPPORT OF RULE 16 MOTION TO COMPEL DISCOVERY** |

I, Max Budziak, declare as follows:

1. I understand how to operate the LimeWire software. I have used it extensively over the course of several years. I understood how to enable and disable the software control for sharing of files on the LimeWire network with others.

//

//

//

//

-1-

DEFENDANT'S EXHIBIT
A

2. At all times that I used the LimeWire software, I disabled the default share function of that software, thereby electing not to, and preventing others from accessing and downloading files on my computer via the LimeWire network.

I declare under penalty of perjury under the law of the State of California that the above is correct to the best of my knowledge. Dated this __13__ day of December, 2010 in Oakland, CA.

Max Budziak

WM. MICHAEL WHELAN, JR.
ATTORNEY AT LAW
95 S. MARKET STREET, SUITE 300
SAN JOSE, CALIFORNIA 95113
(650) 319-5554

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 10/26/10

ARISTA RECORDS LLC; ATLANTIC
RECORDING CORPORATION; BMG
MUSIC; CAPITOL RECORDS LLC, fka
CAPITOL RECORDS, INC.; ELEKTRA
ENTERTAINMENT GROUP INC.;
INTERSCOPE RECORDS; LAFACE
RECORDS LLC; MOTOWN RECORD
COMPANY, L.P.; PRIORITY RECORDS
LLC; SONY MUSIC ENTERTAINMENT, fka
SONY BMG MUSIC ENTERTAINMENT;
UMG RECORDINGS, INC.; and WARNER
BROS. RECORDS INC.,

                Plaintiffs,

v.

LIME WIRE LLC; LIME GROUP LLC;
MARK GORTON; GREG BILDSON; and
M.J.G. LIME WIRE FAMILY LIMITED
PARTNERSHIP,

                Defendants.

06 Civ. 05936 (KMW)
ECF CASE

[PROPOSED] CONSENT
INJUNCTION

Plaintiffs ARISTA RECORDS LLC; ATLANTIC RECORDING CORPORATION;

BMG MUSIC; CAPITOL RECORDS LLC, fka CAPITOL RECORDS, INC.; ELEKTRA

ENTERTAINMENT GROUP INC.; INTERSCOPE RECORDS; LAFACE RECORDS LLC;

MOTOWN RECORD COMPANY, L.P.; PRIORITY RECORDS LLC; SONY MUSIC

ENTERTAINMENT, fka SONY BMG MUSIC ENTERTAINMENT; UMG RECORDINGS,

INC.; VIRGIN RECORDS AMERICA, INC.; and WARNER BROS. RECORDS INC.

(collectively, "Plaintiffs") and LIME WIRE LLC; LIME GROUP LLC; and MARK GORTON

(collectively, "Lime Wire") ("Plaintiffs' and Lime Wire are referred to jointly herein as the

"Parties") hereby stipulate as follows:

WHEREAS, Plaintiffs have filed a Motion for a Permanent Injunction Against Lime

Wire (Doc. No. 234); and

1



DEFENDANT'S
EXHIBIT
B
PENGAD-Bayonne, N. J.

WHEREAS, Plaintiffs and Lime Wire have agreed to a consensual resolution of the Motion for Permanent Injunction.

NOW, THEREFORE, the Parties agree and stipulate as follows:

[1]     The Permanent Injunction that appears below shall be deemed entered as an Order of the Court. Lime Wire's stipulation as to Part I of the Permanent Injunction is to the form thereof and does not constitute an admission of the matters stated therein or preclude Lime Wire from contesting any such matters at any point in the litigation, including on appeal (except any challenge to the Consent Injunction, including the Permanent Injunction, all of which Lime Wire may contest in any court only on appeal after the entry of a final judgment in this action). Lime Wire reserves its arguments as to the Court's liability determinations in the Opinion and Order entered May 11, 2010, and amended on May 25, 2010 ("Order") (Doc. No. 223, amending Doc. No. 216) in any appeal that may follow the entry of a final judgment in this action. Lime Wire will not take any appeal from or otherwise contest in any court this Consent Injunction, including the Permanent Injunction below, prior to the entry of a final judgment in this action.

[2]     The Parties agree that this Court has jurisdiction to enter this Consent Injunction, including the Permanent Injunction below, and to enforce the same pursuant to the terms hereof.

[3]     No security shall be required with respect to the entry of any of the provisions of this Consent Injunction, including the Permanent Injunction below.

## PERMANENT INJUNCTION

The Court enters a Permanent Injunction in favor of the Plaintiffs, and against Lime Wire pursuant to 17 U.S.C. § 502 and Federal Rule of Civil Procedure 65 and in accordance with the following terms.

2

## I.    PERMANENT INJUNCTIVE RELIEF IS WARRANTED

In its Order, the Court held Lime Wire liable for inducement of copyright infringement, as well as for common law copyright infringement and unfair competition as to Plaintiffs' protected pre-1972 works. The evidence showed as a matter of law that:

- Lime Wire "intentionally encouraged direct infringement" by Lime Wire users. (Order at 29.)

- The LimeWire client software is used "overwhelmingly for infringement," and allows for infringement on a massive scale." (*Id.* at 31, 33.)

- Lime Wire knew about "the substantial infringement being committed" by Lime Wire users. (*Id.* at 32.)

- Lime Wire marketed itself to Napster users, who were known copyright infringers, and promoted Lime Wire's infringing capabilities. (*Id.* at 33-34.)

- Lime Wire "actively assisted infringing users" in their infringement efforts and tested the LimeWire client software by searching for copyrighted material. (*Id.* at 35-36.)

- Lime Wire failed to implement any meaningful technological barriers or design choices aimed at diminishing infringement. (*Id.* at 38.)

- Lime Wire's business model depends on mass infringement, relying on a "massive user population generated by" the LimeWire software's "infringement-enabling features." (*Id.* at 37.)

The result of this and other acts evidencing Plaintiffs' intent has been infringement of Plaintiffs' works on a "massive scale." (*Id.* at 33.) Lime Wire has an "enormous user base." (*Id.* at 36.) In June of 2005, Lime Wire proclaimed itself the "industry standard" for peer-to-peer file-sharing, and estimated that more than 3 billion songs were downloaded through peer-to-peer file-sharing every month. (Plaintiffs' Statement of Undisputed Facts ("SUF") ¶ 90.) "[N]early all of the files shared and downloaded by LimeWire users are copyrighted, and not authorized for free distribution through LimeWire." (Order a. 31-32.) Plaintiffs' evidence at summary

1

11

judgment further showed that 98.8% of all download requests among LimeWire users are for unauthorized files, and many of those files contain one of Plaintiffs' protected works. (SUF ¶¶ 109-110.)

In the nearly two years since the parties filed their respective summary judgment motions, LimeWire has continued to be a tool of choice for rampant infringement of Plaintiffs' works. Since July 2008, the LimeWire client software has been downloaded from the download.com website more than *50 million times*, bringing the total downloads of the client from just that one website – *i.e.*, exclusive of downloads from Lime Wire's own website - to more than 200 million (and counting). In short, Lime Wire's already enormous installed base has only gotten bigger in the last two years.

The LimeWire client software not only continues to be downloaded, but also continues to be used for the widespread infringements that Lime Wire intended to induce. Lime Wire is still in operation today, affording its user base unlimited access to the millions of unauthorized files available for download. Lime Wire's liability was established based on a subset of 30 Recordings, in accordance with Judge Lynch's instructions. (*See* Order at 5 n.7.) Every one of those 30 Recordings is still fully available for download through Lime Wire. (Declaration of Jillian Song ("Song Decl.") ¶ 4.) Plaintiffs also submitted evidence that hundreds of recordings currently on Billboard Magazine's charts of Top 40 hits for Country, Rock, Pop, Latin Pop, as well as the years 2008 and 2009 are also available for immediate download through the LimeWire System and Software. (Song Decl. ¶¶ 5-6.)

Based on this record of both proven intentional inducement of infringement, and continued inducement of infringement even after the Court found it liable, the evidence warrants injunctive relief for Plaintiffs. Indeed, in analogous cases where courts have found defendants liable on summary judgment for inducing infringement, the same courts have held that the plaintiff copyright owners are entitled to a permanent injunction, notwithstanding that further litigation (including on the issue of damages) remains. *See e.g., Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1241 (C.D. Cal. 2007) ("*Grokster Remand*"):

4

*Columbia Pictures Indus., Inc. v. Fung*, No. CV 06-5578 SVW (JCx) (Doc. No. 426) (C.D. Cal.,

May 20, 2010) (Declaration of Kelly Klaus ("Klaus Decl."), Ex. 2); *Arista Records, et. al. v.*

*Usenet.com Inc.*, No. 07-CV-8822 (HB) (Doc. No. 284) (S.D.N.Y., Oct. 8, 2009) (Klaus Decl.,

Ex. 1).

To obtain a permanent injunction, Plaintiffs must show:

> (1) that [they] ha[ve] suffered an irreparable injury; (2) that
> remedies available at law, such as monetary damages, are
> inadequate to compensate for that injury; (3) that, considering the
> balance of hardships between the plaintiff and defendant, a remedy
> in equity is warranted; and (4) that the public interest would not be
> disserved by a permanent injunction.

*Salinger v. Colting*, _____ F. 3d. _____, 2010 WL 1729126, at *7 (2d Cir. April 30, 2010)

(quoting *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)). Each of the four

factors weighs in favor of a permanent injunction.

A.  **Plaintiffs Have Suffered Irreparable Harm And Will Continue To Do So Absent An Injunction**

Plaintiff's have suffered – and will continue to suffer – irreparable harm from Lime

Wire's inducement of widespread infringement of their works. "Irreparable harm" is an "injury

that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an

award of monetary damages." *Forest City Daly Hous., Inc. v. Town of N. Hempstead*, 175 F.3d

144, 153 (2d Cir. 1999); *see also Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110,

118 (2d Cir. 2009). As a direct result of Lime Wire's intentionally inducing widespread

infringement, Plaintiffs are continuing to suffer at least three forms of harm judicially recognized

to be irreparable.

---

[1] In the well-known cases involving two other of Lime Wire's predecessors – Napster and
Aimster – the courts issued injunctions against the defendants even without a summary judgment
of liability. *See A&M Records, Inc. v Napster, Inc.*, 284 F.3d 1091, 1099 (9th Cir. 2002)
(affirming District Court's order to shut down the Napster service); *In re Aimster Copyright*
*Litigation*, 334 F.3d 643, 656 (7th Cir. 2003) (affirming injunction against Aimster).

*First*, Plaintiffs face irreparable harm because it is virtually certain that they will be entitled to an enormous damage award after trial that will far exceed Lime Wire's ability to pay. *See Grokster Remand*, 518 F. Supp. 2d at 1217 ("Because it is extremely unlikely that [defendants] will be able to compensate Plaintiffs monetarily for the infringements it has induced in the past, or the infringements it could induce in the future . . . Plaintiffs have and will continue to suffer irreparable harm."); *Aimster*, 334 F.3d at 655.

As in *Grokster* and *Aimster*, Plaintiffs have been and will be irreparably harmed because Lime Wire will most likely be liable for more in damages than it will ever be able to pay. *See Grokster Remand*, 518 F. Supp. 2d at 1217. As they are entitled to do, Plaintiffs seek statutory damages under the Copyright Act as a remedy for Lime Wire's unlawful conduct. (First Amended Complaint ¶¶ 74, 87, 99). Where the defendant's conduct is willful, the range of statutory damages runs from $750 to *$150,000*. *See* 17 U.S.C. § 504(a)(2)-(c). "[I]n order to prove willfulness, a plaintiff must show that the defendant knew or should have known that its conduct constituted copyright infringement." *Branch v. Ogilvy & Mather, Inc.*, 772 F. Supp. 1359, 1364 (S.D.N.Y. 1991). Plaintiffs' uncontroverted evidence has proven "that LW intended to encourage infringement by distributing LimeWire" given in part "LW's awareness of substantial infringement by users"; "that LW knew that LimeWire users were committing copyright infringement"; and that "[t]he massive scale of infringement committed by LimeWire users, and LW's knowledge of that infringement, supports a finding that LW intended to induce infringement." (Order at 31-33.) This evidence, along with numerous other items detailed in the summary judgment record, shows Lime Wire almost certainly will be liable for statutory damages where the upward limit for each statutory award is $150,000. *See Grokster Remand*, 518 F. Supp. 2d at 1217 (noting the "potential relationship between inducement and a finding of willfulness").

Multiplied by the many thousands of works at issue – the other component in a calculation of statutory damages—it is clear that, as in *Grokster*, the amount of potential

6

statutory damages at issue here "is so staggering" that it "would very probably be well beyond" Lime Wire's "anticipated resources." *Grokster Remand*, 518 F. Supp. 2d at 1217.

*Second*, Plaintiffs are being subjected to a different, but no less irreparable, type of injury from the nature of the infringement that Lime Wire has induced, specifically from the continued infringement of their works through Lime Wire's viral system. Plaintiffs have the exclusive right to reproduce and distribute their copyrighted works. 17 U.S.C. § 106. Even if a full damages award were somehow satisfied, Lime Wire's large-scale unauthorized distribution of digital copies of Plaintiffs' copyrighted works will continue to facilitate generations of infringement. *See Grokster Remand*, 518 F. Supp. 2d at 1217. Each time an illegal copy of one of Plaintiffs' copyrighted works is downloaded through the LimeWire software, that copy may then be used to spawn countless derivative infringing copies. This inflicts exponential harm on Plaintiffs' exclusive rights. *See Twentieth Century Fox Film Corp. v. Streeter*, 438 F. Supp. 2d 1065, 1072, 1073 n.2 (D. Ariz. 2006) (every user "who receives one of the copyrighted works [through the peer-to-peer service] is in turn capable of also transmitting perfect copies of the works. . . . Accordingly, the process is potentially exponential rather than linear, threatening virtually unstoppable infringement of the copyright."). Because damages cannot address this continued vulnerability, Lime Wire's induced infringement causes irreparable harm. *See Forest City Daly Hous. Inc.*, 175 F.3d at 153 (harm that cannot be remedied by damages award is irreparable).

*Third*, Plaintiffs face irreparable harm because Lime Wire facilitates the unauthorized, free distribution of Plaintiffs' copyrighted works — precisely the same product that Plaintiffs pay millions to market and sell to consumers. *Salinger*, 2010 WL 1729126, at *9-10. "[T]he availability of free infringing copies of Plaintiff's works" through Lime Wire "irreparably undermines the growing legitimate market for consumers to purchase access to the same works." *Pung*, No. CV 06-5578 SVW(JCx) at 3-4 (Klaus Decl., Ex. 2). As a result of Lime Wire's inducement, generations of potential purchasers of Plaintiffs' products have instead grown up accustomed to downloading their music for free. *See Metro-Goldwyn-Mayer Studios Inc. v.*

7

*Grokster. Ltd.*, 545 U.S. 913, 928-29 (2005) ("digital distribution of copyrighted material threatens copyright holders as never before, because every copy is identical to the original, copying is easy, and many people (especially the young) use file-sharing software to download copyrighted works"); *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1017 (9th Cir. 2001) (citing "Napster's deleterious effect on the present and future digital download market"). That harm can never be remedied in money damages; an injunction must issue.

## B. Plaintiffs Have No Adequate Remedy At Law

Where, as here, the defendants will be unable to pay the likely award of damages following trial, the adequacy-of-legal-remedy analysis mirrors the irreparable harm inquiry. *Grokster Remand*, 518 F. Supp. 2d 1219-20. Although the Copyright Act provides that Plaintiffs must receive an award of statutory damages based on the infringing conduct in this case, 17 U.S.C. § 504(c), that remedy at law almost certainly will be inadequate to compensate Plaintiffs for the infringements of copyright that Lime Wire intentionally induced. Lime Wire's widespread dissemination of the LimeWire software has left Plaintiffs' copyrighted works vulnerable to massive and continuing infringement by millions upon millions of users. Moreover, while damages will be part of the appropriate remedy for past infringement, they cannot protect Plaintiffs against future infringements. Only a permanent injunction can do so.

## C. The Balance Of Hardships Is Wholly In Plaintiffs' Favor

With respect to the balance of hardships, the "massive scale" of infringement through the LimeWire client has caused great and irreparable injury to Plaintiffs, and any hardship to Lime Wire by the injunction is far outweighed by that injury. (Order at 33.) Lime Wire cannot be heard to complain of injury, when its business is based on profiting from the copyright infringement that Lime Wire intentionally induced. (*Id.* at 36.)

8

### D. The Public Interest Favors an Injunction

The injunction will not harm, but rather will serve, the public interest. The public interest is served by upholding copyright protections and, given the harm caused by Lime Wire, a permanent injunction is necessary to preserve the integrity of those protections.

For all the foregoing reasons, the permanent injunction entered herein is appropriate.

## II. TERMS OF THE PERMANENT INJUNCTION

### A. Definitions

For purposes of this Permanent Injunction, capitalized words and phrases not otherwise defined shall have the meanings set forth below:

(a) "Lime Wire" means Lime Group LLC, Lime Wire LLC, and Mark Gorton, and each of them, and their officers, agents, directors, servants, employees, salespersons, independent contractors, attorneys, distributers, corporations, parents subsidiaries, affiliates, successors, assigns, and all those persons in active concert or participation with each or any of them who receive actual notice of this Permanent Injunction

(b) "LimeWire System and Software" means:

(i) Any and all versions of the software program that Lime Wire has distributed under the names "LimeWire," "LimeWire BASIC," "LimeWire Extended PRO" or "LimeWire PRO" or any other program of comparable functionality regardless of the trade name under which Lime Wire has distributed;

(ii) The computer hardware and servers operated by or on behalf of Lime Wire;

(iii) The limewire.com and limewire.org websites operated by or on behalf of Lime Wire; and

9

(c)     And any other technological system operated by or on behalf of Lime Wire, and any conduct by or on behalf of Lime Wire enabling users to connect to and use computer networks to reproduce and distribute unauthorized copies of digital files.

(d)     "LimeWire Software" refers only to the software programs distributed by Lime Wire as defined above in paragraph (b)(i).

(e)     "Comparable System," "Comparable Software" and/or "Comparable System and Software" means

(i)     any system or software that is substantially comparable to the LimeWire System and Software, including but not limited to FrostWire, Acquisition, BearFlix, Cabos, Gnucleus/GnucDNA, Gtk-gnutella, KCeasy, MP3 Rocket, Phex, Poisoned, Shareazu, Symella, BitTorrent, uTorrent, Vuze/Azureus, BitComet, Transmission, Deluge, BitLord, KTorrent, eDonkey, eMule, aMule, MLDonkey, xMule, Ares Galaxy, MP2P, Manolito, isoHunt, or Piratebay, as those systems or software existed before or as of the date of this Permanent Injunction; and/or

(ii)    any website, server, system, or software that has as a material purpose or a material use the unauthorized reproduction, distribution, communication to the public (whether by transmitting or making available), public performance, or other exploitation of any copyrighted files or works.

(f)     "Copyrighted Works" means all copyrighted works (or portions thereof), whether now in existence or later created, in which any Plaintiff (including its parents, subsidiaries, affiliates, or distributed labels) owns or controls an exclusive right under Section 106 of the United States Copyright Act (17 U.S.C. § 106), or under state or common law,

10

(g) "Users" means any person or entity who or which uses the LimeWire System and Software, or any Comparable System and Software.

(h) "Legacy Users" means Users of LimeWire Software that was distributed prior to the date of this Permanent Injunction.

(i) "Legacy Software" means copies of the LimeWire Software in use by Legacy Users.

(j) "Copyright Filter" means a robust and secure means to exhaustively prevent Users of the LimeWire System and Software from using the LimeWire System and Software, and Users of any Comparable System and Software from using such Comparable System and Software, as applicable, to copy, reproduce, download, distribute, communicate to the public (whether by transmitting or making available), upload, link to, transmit, publicly perform, or otherwise exploit any unauthorized or unlicensed audio or audio-visual Copyrighted Works. Any such Copyright Filter must include the ability to filter both by text (i.e. artist and song title) and by the use of Fingerprinting Technology, as defined below.

(k) "Fingerprinting Technology" refers to the most effective available means of content-recognition filtering based on recognizing the unique content of an underlying audio-visual work and detecting and preventing copying of that content no matter how the file containing the content was created (e.g. whether the file was ripped from a CD, DVD, or recorded from a radio or television, etc.), and which is available from commercial vendors such as Audible Magic.

11

B.   **Terms**

2.   Lime Wire is permanently enjoined and restrained from infringing in any manner any copyright in any and all Copyrighted Works including without limitation by engaging in any of the following without written authority from the relevant Plaintiff:

(a)   copying, reproducing, downloading, distributing (which hereinafter shall include without limitation making a sound recording or work available for distribution by placing it in a computer file or folder that is accessible by others for downloading), communicating to the public, uploading, linking to, transmitting, publicly performing, or otherwise exploiting in any manner any of the Copyrighted Works; and

(b)   directly or indirectly enabling, facilitating, permitting, assisting, soliciting, encouraging or inducing any User to use the LimeWire System and Software or other Comparable System and/or Software

(i)   to copy, reproduce, download, distribute, communicate to the public, upload, link to, transmit, publicly perform, or otherwise exploit in any manner any of the Copyrighted Works, or

(ii)   to make available any of the Copyrighted Works for copying, reproduction, downloading, distributing, communicating to the public, uploading, linking to, transmitting, public performance, or any other exploitation;

(c)   directly or indirectly operating or assisting in or supporting the operation of any computer server or website or distributing any software in any way related to the LimeWire System and Software, or any other Comparable System and Software that enables, facilitates, permits, assists, solicits, encourages, or induces the copying, reproduction,

downloading, distributing, uploading, linking to, transmitting, public performance, or other exploitation of any of the Copyrighted Works.

(d)     Lime Wire is further ordered to immediately cease and desist from displaying, or permitting to be displayed any advertising in, through or by means of the LimeWire Software, as well from displaying the source code for the LimeWire Software through the LimeWire System and Software or through any Comparable System and Software.

5.     Using its best efforts, Lime Wire shall use all reasonable technological means to immediately cease and desist the current infringement of the Copyrighted Works by Legacy Users through the LimeWire System and Software, and to prevent and inhibit future infringement of the Copyrighted Works by Legacy Users of the LimeWire System and Software, including without limitation by

(a)     disabling the searching, downloading, uploading, file trading and/or file distribution functionality, and/or all functionality, of the Legacy Software,

(b)     establishing default settings in the Legacy Software that block the sharing of unauthorized media files;

(c)     providing all Users with a tool to uninstall the Legacy Software;

(d)     including a Copyright Filter in the Legacy Software, including (to the extent necessary to comply with this Paragraph) creating a new version of the LimeWire System and Software that incorporates a Copyright Filter ("New Version").

(e)     before distributing any New Version, Lime Wire must obtain approval to do so from Plaintiffs and the Court. In order to obtain the necessary approvals, Lime Wire must provide the New Version to Plaintiffs and the Court, and Plaintiffs will report to the Court within 30 days of receipt of an operable New Version whether Plaintiffs consider the New Version to

13

comply with the requirements of this Permanent Injunction. If Plaintiffs consider the New Version to violate any of the terms of this Permanent Injunction, Plaintiffs shall inform the Court of the reasons why; and

    (f)    if it is permitted to distribute a New Version, Lime Wire must use all reasonable lawful means to cause, encourage, persuade, and/or compel Legacy Users to upgrade from Legacy Software to the New Version.

    4.    Lime Wire shall give notice of this Permanent Injunction

    (a)    to each of Lime Wire's respective officers, agents, servants, employees, attorneys, principals, direct and indirect shareholders; and

    (b)    to all Users of the LimeWire System and Software, through any available means of communicating with Users, including but not limited to

    (i)    posting a message on the websites within the LimeWire System and Software giving notice of this injunction, and informing Users that it is illegal to upload and/or Download unauthorized copies of copyrighted works;

    (ii)    sending the same message to any User who connects to the LimeWire System and Software;

    (iii)    emailing all of the Users of the LimeWire System and Software whose identities and e-mail addresses are known to Lime Wire; and

    (c)    to all persons with whom Lime Wire communicates regarding any actual or potential transfer (whether by sale, lease, license, assignment, conveyance, transfer without consideration, or otherwise) of any ownership interest in them or any interest in any of their significant assets (including without limitation any source code, object code, other technology, domain names, trademarks, brands, assets, or goodwill in any way related to the LimeWire

14

System and Software); and to all successors, transferees, licensees, or other assignees, and all those persons in active concert or participation with each or any of them.

     5.    Lime Wire must file a report on its progress with the Court within 14 days of the entry of this Permanent Injunction. The required report must:

     (a)    certify that distribution, sales and advertising has stopped;

     (b)    identify what steps have been taken to comply with the requirements of Paragraph 2;

     (c)    quantify the precise effect of the identified steps on the ongoing infringement of the Copyrighted Works, including but not limited to identifying how many songs charting on the then-current Billboard Magazine Top 200 list are or remain available for download through the LimeWire System and Software; and

     (d)    identify what further steps are in the process of being made or will be made to combat ongoing infringement as required by Paragraph 2.

     6.    If Lime Wire (or any individual defendant) sells, leases, licenses, conveys, gives away, transfers or otherwise assigns all or any significant part of the business, equity, operations or assets of Lime Group LLC, Lime Wire LLC, or the Lime Wire System and Software (including without limitation any part of the source code, object code, other technology, domain names, trademarks, brands, assets, or goodwill in any way related to the LimeWire System and Software), it will require, as a condition of any such transaction, that each purchaser, lessee, or other transferee or assignee (each, a "Transferee") (a) submit to this Court's jurisdiction and venue and fully waive and relinquish any argument that venue or jurisdiction by this Court is improper or inconvenient, and (b) agree to be bound by the terms of this Permanent Injunction.

Lime Wire shall not permit any such transaction to close unless and until the Court has entered such an order as to the Transferee.

7.    Nothing in this Permanent Injunction shall limit the right of Plaintiffs to recover all moneys available under law on account of Lime Wire's violations of law, including without limitation all damages allowed under 17 U.S.C. § 504 for any and all infringements of Plaintiffs' copyrights for which Lime Wire is liable; all damages allowed under applicable state law; attorneys' fees, including without limitation attorneys' fees authorized under 17 U.S.C. § 505, and the costs of this suit.

8.    Any person or entity found to be in violation of this Permanent Injunction shall be subject to all applicable penalties and punishments allowed by law, including without limitation for contempt of Court.

9.    The Court shall maintain continuing jurisdiction over this action, including with respect to damages and costs, including attorneys' fees, for the purposes of enforcing this Permanent Injunction, for the purpose of entering final judgment against Lime Wire on the claims resolved by the Order, and for the purpose of resolving the issues and claims that remain open in the case.

10.    If, on appeal or otherwise in this litigation, any Lime Wire defendant (as defined

on Page 1 above) is found not liable on all of Counts I-V in Plaintiffs' First Amended Complaint,

the terms of the [Proposed] Consent Injunction shall no longer be binding against such

defendant(s).

STIPULATED AND AGREED TO ON BEHALF OF PLAINTIFFS AND LIME WIRE, BY
THEIR COUNSEL OF RECORD

Dated: 8/9, 2010

_____
Glenn D. Pomerantz

Attorney for Plaintiffs
Munger, Tolles & Olson LLP
355 South Grand Avenue, 35th Floor
Los Angeles, California 90071-1560
(213) 683-9100; (213) 687-3702 (Fax)
Kelly.Klaus@mto.com

Dated: Aug 9, 2010

_____
Colleen Bal

Attorney for Defendants
Wilson Sonsini Goodrich & Rosati, P.C.
1301 Avenue of the Americas, 40th Floor
New York, New York 10019
(212) 999-5800; (212) 999-5899 (Fax)
msonnier@wsgr.com

PURSUANT TO STIPULATION, IT IS SO ORDERED.

Dated, 10-26, 2010

_____
KIMBA M. WOOD
United States District Judge

15